FILED
IN CLERKS OFFICE

2005 JAN 21  A 11: 45

U.S. DISTRICT COURT
DISTRICT OF MASS.

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

05 - 10134 GAO

| | |
|---|---|
| DR. RICHARD BASSIN, On Behalf of Himself and All Others Similarly Situated, ) ) ) | No. |
| Plaintiff, ) ) | CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| vs. ) ) | |
| PRAECIS PHARMACEUTICALS, INC., MALCOLM L. GEFTER, Ph.D., KEVIN F. MCLAUGHLIN, EDWARD C. ENGLISH and WILLIAM K. HEIDEN, ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. ) ) | |

RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED_____
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK._____
DATE_____

MAGISTRATE JUDGE_____

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Praecis Pharmaceuticals, Inc. ("Praecis" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the common stock of Praecis between November 25, 2003, and December 6, 2004, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as and many of the acts and practices complained of herein occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Dr. Richard Bassin, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Praecis at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant Praecis is a Delaware corporation with its principal place of business located at 830 Winter Street Waltham, MA 02451. Praecis is a biopharmaceutical company focused on the discovery and development of therapies to address unmet medical needs. The Company's first United States Food and Drug Administration ("FDA")-approved product is Plenaxis, which is a treatment for advanced symptomatic prostate cancer in men.

8.      (a)     Defendant Malcolm L. Gefter, Ph.D. ("Gefter") served as Praecis' Chairman and Chief Executive Officer during the Class Period.

(b)     Defendant Kevin F. McLaughlin ("McLaughlin") served as Praecis' Chief Financial Officer during the Class Period until September 2004 when he was promoted to the position of President and Chief Operating Officer.

(c)     Defendant Edward C. English ("English") served as Praecis' Vice President, Chief Financial Officer and Treasurer from September 2004 to the present.

(d)     Defendant William K. Heiden ("Heiden") served as Praecis' President and Chief Operating Officer until September 2004.

(e)     Defendants Gefter, McLaughlin, English and Heiden are collectively referred to herein as the "Individual Defendants."

9.      Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of

- 2 -

actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Praecis, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and

- 3 -

accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Praecis, each of the Individual Defendants had access to the adverse undisclosed information about Praecis' financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Praecis and its business issued or adopted by the Company materially false and misleading.

13.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Praecis common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Praecis' business, operations, management and the

- 4 -

intrinsic value of Praecis common stock; (ii) enabled insiders to sell close to $4.5 million of their personally-held shares of Praecis stock at artificially inflated prices; and (iii) caused Plaintiff and other members of the Class to purchase Praecis common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Praecis between November 25, 2003, and December 6, 2004, inclusive and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Praecis common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Praecis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

- 5 -

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Praecis; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

20. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**Background Facts**

21. Praecis describes itself as a "biopharmaceutical company focused on the discovery, development and commercialization of innovative therapies to address significant unmet medical needs."

22. On November 25, 2003, the Company announced that the FDA had approved its lead product, Plenaxis (abarelix for injectable suspension).

23. Plenaxis is indicated for the palliative treatment of men with advanced symptomatic prostate cancer, in whom LHRH agonist therapy is not appropriate and who refuse surgical

castration, and have one or more of the following: (1) risk of neurological compromise due to metastases, (2) ureteral or bladder outlet obstruction due to local encroachment or metastatic disease, or (3) severe bone pain from skeletal metastases persisting on narcotic analgesia.

24.    Throughout the Class Period, defendants made numerous statements regarding the increasing adoption of Plenaxis and the positive impact it was having on the Company's operating results. In truth and in fact, however, Praecis's operating results during the Class Period were artificially inflated as a result of the Company's improper recognition of revenue, which also violated Generally Accepted Accounting Principles ("GAAP"). Specifically, the Company recognized revenue at the time that it shipped its product to distributors without adequately reserving for product returns. The impact that this accounting treatment was having on the Company's sales became evident on December 6, 2004, when defendants disclosed that the Company's fourth-quarter sales would fall behind its third-quarter results because of the slow adoption of its cancer drug Plenaxis. The Company also stated that it would cease to provide any future guidance on its earnings and revenues until a consistent trend for Plenaxis sales emerges.

25.    Upon this disclosure, shares of the Company's stock fell more than 25%, or $0.56 per share, to close at $1.61 per share, on extremely high trading volume.

26.    Prior to disclosing these adverse facts to the investing public, defendants Gefter and McLaughlin sold their personally-held Praecis common stock to the unsuspecting public for close to $4.5 million in proceeds.

**Materially False and Misleading Statements Issued During The Class Period**

27.    The Class Period begins on November 25, 2003. On that date, the Company issued a press release announcing that the FDA had approved its lead product, Plenaxis (abarelix for injectable suspension). Defendant Gefter, commenting on the approval, stated in pertinent part, as follows:

We are delighted with the approval, and would like to thank the FDA for diligently working with us to make this drug available for those prostate cancer patients who are most in need. The approval of Plenaxis(TM) represents years of dedication to drug discovery and development at PRAECIS to bring an innovative product to the market and marks an important milestone in our transition to a fully integrated pharmaceutical company. More importantly, this approval will bring a valuable therapy to those patients in the indicated population who have limited or no other treatment options available.

Defendant Heiden continued, stating in pertinent part, as follows:

**We are extremely excited about the launch of our first product and the revenue opportunity it represents**. We will begin hiring the Plenaxis(TM) sales force immediately, with initial product shipment targeted for early in the first quarter of 2004. [Emphasis added.]

28.    On January 30, 2004, the Company issued a press release announcing its financial results for the fourth quarter and year end of 2003, the period ended December 31, 2003. For the quarter, the Company reported a net loss of approximately $16,048,000, or $0.31 per diluted share. For the year, the Company reported a net loss of approximately $55,798,000, or $1.08 per diluted share. Defendant Gefter commented on the Company's progress, stating, in pertinent part, as follows:

The past year was one of significant accomplishment for PRAECIS. In November, we achieved our primary goal for 2003 with the receipt of approval from the United States Food and Drug Administration (FDA) to market Plenaxis(TM) in the United States. This approval marks our transition to a fully integrated pharmaceutical company with capabilities spanning drug discovery, clinical development, manufacturing and commercialization. The approval of Plenaxis(TM) also validates our scientific approach of using proprietary technologies to maximize the success of selecting drug candidates for development and commercialization, thereby minimizing high rates of failure. These technologies enable our scientists to conduct a battery of tests to determine the most appropriate drug candidates for advancement into clinical development. This approach was utilized in selecting Plenaxis(TM) and Apan, our compound for the treatment of Alzheimer's disease, for development, and we intend to use these technologies when selecting future development candidates. We believe that the approval of Plenaxis(TM) confirms our team's ability to translate innovative scientific discoveries into commercial reality, effectively and efficiently.

With regard to the commercialization of Plenaxis, the press release continued, in pertinent part, as follows:

- 8 -

Commercialization of Plenaxis(TM)

With regard to the commercialization efforts for Plenaxis(TM), the Company has begun shipping product to distributors. Since receipt of FDA approval for Plenaxis(TM) in late November 2003, the Company has hired and trained its medical science liaisons and its regional sales managers, and is aggressively hiring and training its estimated 40 field sales representatives. The Company is currently launching a variety of important marketing initiatives and is leveraging its key opinion leader support through a host of educational programs in the United States.

Defendant Heiden continued, in pertinent part, as follows:

We are extremely pleased to announce that Plenaxis(TM) is now available through our authorized distributors to physicians and hospital pharmacies enrolled in the Plenaxis(TM) User Safety (PLUS) Program. Our goal is to have 100% of our sales force hired, trained and in the field by early in the second quarter of 2004. With an expected average of 6-8 years of experience, our well-seasoned field force will provide urologists and oncologists with significant insight into this new treatment for advanced symptomatic prostate cancer.

The approval of Plenaxis(TM) is enabling us to build a commercialization infrastructure that adds tremendous value to our organization. We can leverage this infrastructure to position ourselves as a partner of choice for commercializing other urology/oncology products, advance our future products and maintain greater control when evaluating partnership opportunities for our clinical stage products.

With regard to the future prospects for Plenaxis, the press release stated, in pertinent part, as follows:

[t]he market for currently available hormonal therapies to treat prostate cancer is approximately $1.2 billion in the United States. The Company believes that the long-term revenue opportunity for Plenaxis(TM) may represent 15% or more of this market.

29.    In a conference call with investors, defendant McLaughlin, commenting on the commercialization of Plenaxis stated, in pertinent part, as follows:

Obviously a big effort that is underway right now is the commercialization of Plenaxis. And with regard to the commercialization efforts for Plenaxis, the Company has begun shipping product to distributors. Since the receipt of the FDA approval for Plenaxis in late November 2003, the Company has hired and trained its medical science liaisons and its regional sales managers and is aggressively hiring and training its estimated 40 field sales representatives. The Company is currently launching a variety of important market initiatives and is leveraging its key opinion leader support through a host of educational programs in the United States.

- 9 -

As a Bill Heiden mentioned in our press release, we're obviously extremely pleased to announce that Plenaxis is now available through our authorized distributors to physicians and hospital pharmacies enrolled in the Plenaxis user safety program, also known as the Plus program. Our goal is to have 100 percent of our sales force hired, trained and in the field by early in the second quarter of 2004. We expect an average experience level of 6-8 years and this well seasoned field force will provide neurologists and oncologists with significant insight into this new treatment for advanced symptomatic prostate cancer.

Additionally, we stated that the approval of Plenaxis is enabling us to build a commercialization infrastructure that adds tremendous value to our organization. We can leverage this infrastructure to position ourselves as a partner of choice for commercializing other urology oncology products, advance our future products and maintain greater control when evaluating partnership opportunities for our clinical stage products. The Company is continuing to evaluate the potential utility of Plenaxis in other indications to further exploit its unique mechanism of action. As part of this process, the Company has established several groups of experience clinical advisers and continues to work closely with these groups of experts to identify indication with the use of Plenaxis may provide innovative advantages compared to existing therapies.

We also are talking about the pricing of Plenaxis, and as we noted, *the Company has begun shipping product to its authorized distributors*. The Company has established the initial wholesale acquisition cost for Plenaxis as $787 for a 100 MG (ph) Plenaxis kit. [Emphasis added].

30.     On February 21, 2004, the Company issued a press release announcing that it had signed a preferred distribution agreement with McKesson Corp. for Plenaxis.

31.     On March 15, 2004, Praecis filed its Form 10-K for the fourth quarter and year end 2003 with the SEC, which confirmed the previously-announced financial results and was signed by defendant McLaughlin. With regard to the Company's revenue recognition policy, the 10-K stated, in pertinent part, as follows:

Revenue Recognition

*Revenue is deemed earned when all of the following have occurred: all obligations of the Company relating to the revenue have been met and the earning process is complete; the monies received or receivable are not refundable irrespective of research results; and there are neither future obligations nor future milestones to be met by the Company with respect to such revenue.* [Emphasis added.]

32.    On March 31, 2004, the Company announced that it had been informed by The Centers for Medicare & Medicaid Services ("CMS") that Plenaxis had qualified for transitional pass-through payment under the Medicare hospital outpatient prospective payment system ("HOPPS"). The press release continued, in pertinent part, as follows:

> "PRAECIS greatly appreciates the diligent efforts of CMS in reaching this determination in such an expeditious manner for this important new product," stated William K. Heiden, PRAECIS' President and Chief Operating Officer.
>
> Medicare generally reimburses hospital outpatient departments based on "ambulatory payment classifications" (APCs) representing bundled payments for services and items including drugs provided to a patient. CMS determines APCs based on historical data pertaining to the associated procedures. Under the "pass-through" system, hospital outpatient departments may "pass-through" for reimbursement a portion of certain new technology costs that may not have been factored in to the development of the APCs. CMS has communicated that specific coding and payment instructions regarding Plenaxis(TM) pass-through payment will be announced in the July 2004 OPPS Update.
>
> Hospital outpatient departments furnishing Plenaxis(TM) in accordance with Medicare coverage criteria on or after January 1, 2004, and prior to July 1, 2004 (the effective date of pass-through qualification for Plenaxis(TM)), are eligible for Medicare reimbursement for Plenaxis(TM) in accordance with the Medicare Prescription Drug, Improvement and Modernization Act of 2003. Under this Act, Medicare reimburses hospital outpatient departments at 95% of the average wholesale price for new drugs and biologicals for which a Healthcare Common Procedural Coding System (HCPCS) code has not yet been assigned.
>
> Continuing, Mr. Heiden stated, "We are especially pleased to receive this news now, as *initial interest in Plenaxis(TM) has been very encouraging*, with over 1,000 physicians and hospital pharmacies having enrolled in our PLUS (PLenaxis(TM) User Safety) Program to date." [Emphasis added.]

33.    On April 28, 2004, the Company announced that it had entered into a license, supply and distribution agreement with Schering AG, of Berlin, Germany, for the commercialization of Plenaxis in the field of prostate cancer across Europe, Russia, the Middle East, South Africa, Australia and New Zealand. The press release continued, in pertinent part, as follows:

> Under the agreement, PRAECIS will receive a combination of upfront, regulatory approval and performance-based milestone payments, as well as a share of revenue through transfer price payments based on sales volume for drug product which will

be supplied by PRAECIS. The overall financial terms are intended, depending upon performance levels, to approximate an equal sharing of the value of the product.

34.    On April 30, 2004, the Company issued a press release announcing its first quarter results, the period ended March 31, 2004. For the quarter, the Company reported a net loss of approximately $15,380,000, or $0.29 per diluted share. With regard to the commercialization of Plenaxis, the press release stated, in pertinent part, as follows:

Plenaxis(TM) Commercialization Update

In late January 2004, the Company launched its lead product, Plenaxis(TM), for the treatment of a defined subset of advanced symptomatic prostate cancer patients. During the first quarter of 2004, the Company focused on building its commercial infrastructure to support the launch of Plenaxis(TM) in the United States. Field sales representatives were hired and trained during the first quarter and began calling on potential customers to build product awareness, enroll physicians and hospital pharmacies in the Plenaxis(TM) User Safety (PLUS) Program and generate product sales. In order to ensure that Plenaxis(TM) is widely available to prescribing physicians, the Company has established a network of premier specialty distributors, including: Cardinal Health, CuraScript Pharmacy, Inc., McKesson Specialty Distribution Services, Oncology Therapeutics Network and Priority Healthcare Corporation. During the first quarter, these distributors began shipping product to physicians and hospital pharmacies enrolled in the PLUS Program, and patients are now being treated with Plenaxis(TM).

**The Company generated net revenue of approximately $0.4 million through sales to distributors, representing primarily initial stocking levels. Based upon the first quarter activity, the Company's prior Plenaxis(TM) sales forecast of $10.0 million to $20.0 million in revenue for 2004 remains unchanged.**

As of the date of this release, the Company has hired all of its 40 field sales representatives. The initial impact of the Plenaxis(TM) sales force can be seen in the large number of physicians who have signed up to become authorized Plenaxis(TM) prescribers by enrolling in the PLUS Program. Currently, approximately 1,900 physicians and hospital pharmacies have enrolled in the PLUS Program.

As part of its ongoing educational and promotional efforts, the Company will have a commercial booth at both the upcoming Annual Meeting of the American Urological Association (AUA) being held in San Francisco on May 8-13, 2004 and the Annual Meeting of the American Society of Clinical Oncologists (ASCO) being held in New Orleans on June 5-7, 2004. In connection with the AUA meeting, the Company has provided commercial support for an independent educational satellite symposium entitled "New Insights in the Management of Advanced Symptomatic Prostate Cancer."

With regard to reimbursement, during the first quarter the Company announced that Plenaxis(TM) has qualified for transitional pass-through payment under the Medicare hospital outpatient prospective payment system (HOPPS). The Centers for Medicare & Medicaid Services (CMS) granted transitional pass through status to Plenaxis(TM) in less than one month of the date of filing of the application for that status, with a retroactive effective date to January 1, 2004. This early and prompt action has enabled hospital outpatient clinics to administer Plenaxis(TM) with assurance, well ahead of normal timelines, of reimbursement, provided program requirements are otherwise met. [Emphasis added.]

35.    On May 10, 2004, Praecis filed its Form 10-Q for the first quarter of 2004 with the

SEC, which confirmed the previously-announced financial results and was signed by defendant

McLaughlin. With regard to the Company's revenue recognition policy, the 10-Q stated, in pertinent

part, as follows:

Revenue Recognition

Revenues from product sales are recognized in the period when the product is delivered provided that there is pervasive evidence that an arrangement exists, the price is fixed or determinable and collection of the related receivable is probable. ***Revenues are recorded net of applicable allowances as provision is made for estimated returns, rebates and other applicable discounts and allowances.*** Shipping and other distribution costs are charged to cost of product sales.

The Company prepares its provisions for sales returns and allowances, discounts and rebates based primarily on estimates. Contractual allowances and rebates primarily result from sales under contracts with healthcare providers, Medicaid programs and other government agencies. ***The Company's policy for returns allows authorized distributors to return the product three months prior to, and six months after, product expiration. The reserve for product returns is determined by reviewing the history of product returns for products with similar characteristics to Plenaxis and by utilizing data obtained directly from the Company's authorized distributors.*** These data are reviewed to monitor product movement through the supply chain to identify remaining inventory in the supply chain that may result in chargebacks or returns. The reserves are reviewed at each reporting period and adjusted to reflect data available at that time. To the extent the Company's estimates of contractual allowances, rebates and product returns is different from actuals, it will adjust the reserve which will impact the amount of product sales revenue recognized in the period of the adjustment.

In November 2003, the Company received regulatory approval to market Plenaxis in the United States. There is a launch period initiative undertaken in cooperation with substantially all of the Company's distributors which provides that the payment terms on purchases of Plenaxis during the launch will be up to 120 days.

36.    On May 24, 2004, Praecis issued a press release in connection with its presentation at

the UBS 2004 Global Specialty Pharmaceuticals Conference in which the Company gave an update

on the Company's commercialization efforts for Plenaxis (abarelix for injectable suspension), and

reviewed the Company's research and development programs and its technology platforms. The

press release stated, in pertinent part, as follows:

Plenaxis(TM) was approved by the United States Food and Drug Administration
(FDA) in November 2003 for the treatment of a defined subset of advanced
symptomatic prostate cancer patients. The Company launched Plenaxis(TM) in late
January 2004 and is promoting the product in the United States with its own
marketing and sales team. Discussing the progress of the Plenaxis(TM) launch, Mr.
Heiden noted the following:

-- The first quarter was dedicated to the hiring and training of the 40 person sales
force, and this experienced team is now calling on physicians to educate and build
product awareness, enroll physicians and hospital pharmacies in the Plenaxis(TM)
User Safety (PLUS) Program and generate product sales.

-- The Company has identified approximately 3,500 target prescribers, whom it
believes may represent 80% of the Plenaxis(TM) volume opportunity. As of today,
over 2,200 physicians (and hospital pharmacies) have enrolled as authorized
prescribers in the PLUS Program, more than half of whom are target prescribers.

-- Various promotional support programs (including professional advertising) have
recently been launched following approval by the FDA's Division of Drug
Marketing, Advertising, and Communications, several being made available for the
first time to physicians at the recent American Urological Association meeting held
in San Francisco from May 8-13, 2004.

-- During May 2004, the Company received its first confirmation that several
regional Medicare carriers have already issued physician reimbursement for the in-
office administration of Plenaxis(TM) and expects confirmation regarding
reimbursement by the remaining carriers in the coming months. The Company
believes that confirmation of carrier-level reimbursement is an important step for
physicians considering the use of Plenaxis(TM).

-- The Company is initiating the "Plenaxis(TM) Experience Study," a 2,000 patient
clinical study evaluating the commercial use of Plenaxis(TM) in the indicated patient
population. The study is an FDA postmarketing Phase 4 commitment which will
evaluate the adherence by physicians to the requirements of the PLUS Program. The
study will also be utilized to further assess the frequency of immediate-onset
systemic allergic reactions.

- 14 -

-- The Company has recently received clearance from the FDA to initiate a Phase 1/2 study evaluating the use of Plenaxis(TM) in androgen-independent prostate cancer patients whose disease has progressed following LHRH agonist therapy. Plenaxis(TM) has been shown to directly suppress follicle stimulating hormone (FSH) secretion, which is believed to be an independent growth stimulant of prostate cancer. Many patients treated with hormonal therapies eventually progress to a stage of androgen-independent prostate cancer, and this study will evaluate the potential benefit of suppressing FSH with Plenaxis(TM) in these patients.

Further commenting on the launch of Plenaxis(TM), Mr. Heiden stated, "We are pleased with our progress to date in creating initial awareness and enrolling physicians as potential prescribers through the PLUS Program. However, the uptake of the product by prescribers during the initial sixteen weeks has been somewhat slower than forecasted. Accordingly, the Company is not in a position at this time to confirm its previously issued sales range forecast for 2004. **The Company cannot predict at this time what effect, if any, this could have on its longer-term capital position and previously disclosed expected timing for reaching profitability, but does not currently anticipate that it would be material. In addition, the Company continues to believe that through management of its operating expenses, it will end the year with cash, cash equivalents and marketable securities in the range of approximately $60.0 million to $70.0 million."**

"We remain confident that Plenaxis(TM) offers a compelling treatment alternative for men suffering from advanced symptomatic prostate cancer and we will continue to build upon the successes we have already achieved in the short period of time since the product was approved and launched," Mr. Heiden concluded. [Emphasis added.]

37.    On June 21, 2004, the Company issued a press release announcing that The Centers for Medicare & Medicaid Services ("CMS") had assigned a permanent billing code for Plenaxis (abarelix for injectable suspension) under the Healthcare Common Procedural Coding System ("HCPCS") for use by hospitals in connection with outpatient administration of the drug. As of July 1, 2004, hospitals may use this code to bill Medicare electronically for the use of Plenaxis, which should facilitate prompt and accurate payment of claims. Defendant Heiden, commenting on the announcement, stated, in pertinent part, as follows:

We are pleased to announce that CMS has moved so quickly in assigning a specific reimbursement code for outpatient hospital use of Plenaxis(R). This news confirms previously announced reimbursement levels for Plenaxis(R) in the hospital setting, and this new specific code for Plenaxis(R) will make it easier for hospitals to submit and receive reimbursement for use of the product.

- 15 -

38.    On July 30, 2004, the Company issued a press release announcing its financial results

for the second quarter of 2004, the period ended June 30, 2004. For the quarter, the Company

reported a net loss of approximately $14,842,000, or $0.28 per diluted share and total revenues of

approximately $673,000, driven by sales of Plenaxis. With regard to Plenaxis, the press release

continued, in pertinent part, as follows:

Plenaxis(R) Update

In late January 2004, the Company launched its lead product, Plenaxis(R), for the
treatment of a defined subset of advanced symptomatic prostate cancer patients.
During the first half of 2004, the Company focused on launching Plenaxis(R) by
building a full commercial infrastructure. Included within this build-up was the
hiring and training of a field sales force of approximately 40 individuals as well as
the establishment of the Plenaxis(R) User Safety (PLUS) Program. Physicians who
intend to prescribe Plenaxis(R) must first enroll in the PLUS Program. All of the
field force has been hired, trained and is now calling on physicians and, as of today,
the Company has enrolled approximately 3,000 physicians in the PLUS Program,
with more than 10% having already purchased Plenaxis(R).

"Given our success in enrolling a large number of physicians in our PLUS Program,
we have begun to shift our focus," stated William K. Heiden, the Company's
President and Chief Operating Officer. "While educating new physicians and
enrolling them in the PLUS Program will be important to the long-term success of
Plenaxis(R), our current efforts in the field are focused principally towards assisting
PLUS-enrolled physicians to take the next step and become Plenaxis(R) prescribers.
**We have seen evidence of the success of this strategy in a trend of increasing
weekly sales which began in the latter portion of the second quarter. We expect
to see Plenaxis(R) sales continue to build quarter on quarter over the course of
the year."**

**Longer-term, the Company continues to believe that the revenue opportunity
for Plenaxis(R) may represent 15% or more of the $1.2 billion hormone therapy
market for prostate cancer in the United States**.

Earlier this quarter, the Company announced that it had entered into a license, supply
and distribution agreement with Schering AG, of Berlin, Germany, for the
commercialization of Plenaxis(R) across Europe, Russia, the Middle East, South
Africa, Australia and New Zealand. The agreement provides for a combination of
upfront, regulatory approval and performance-based milestone payments, as well as a
share of revenue through transfer price payments for drug product which will be
supplied by the Company. The transfer price will vary based upon net sales of
Plenaxis(R), as well as pricing and reimbursement levels, in the licensed territory.
The milestone payments to the Company may total over time up to approximately

- 16 -

$90.0 million, dependent upon Euro/U.S. Dollar conversion rates and the attainment of specified annual sales levels, which the majority of the milestone payments are conditioned upon. The overall financial terms are intended, depending upon performance levels, to approximate an equal sharing of the value of the product.

Also previously disclosed, in June 2003, the Company initiated the regulatory review process in the European Union with the submission of a Marketing Authorisation Application (MAA) in Germany seeking approval to market Plenaxis(R) for the treatment of a broad population of hormonally responsive prostate cancer patients. The European registration process is ongoing and the Company anticipates that the German Federal Institute for Drugs and Medical Devices (BfArM) will complete its review of the MAA by late 2004/early 2005. Assuming favorable action by the BfArM, the Company, with the cooperation and assistance of its partner, Schering AG, plans to seek additional European Union member state approvals under the Mutual Recognition Procedure.

Commenting on the results of the second quarter, Malcolm L. Gefter, Ph.D., PRAECIS' Chairman and Chief Executive Officer stated, "The first half of 2004 has been an exciting time for PRAECIS as we launched our first product and integrated commercial operations into the Company. We are also maintaining a strong focus on our pipeline to further the clinical development of Apan and PPI-2458, both promising investigational compounds for the treatment of complex diseases, and are continuing to strengthen our technology platform with Direct Select." [Emphasis added.]

39.    On August 9, 2004, Praecis filed its Form 10-Q for the second quarter of 2004 with the SEC, which confirmed the previously announced financial results and was signed by defendant McLaughlin. With regard to the Company's revenue recognition policy, the 10-Q stated, in pertinent part, as follows:

Revenue Recognition

Revenues from product sales are recognized in the period when the product is delivered, provided there is pervasive evidence that an arrangement exists, the price is fixed or determinable and collection of the related receivable is probable. *Revenues are recorded net of applicable allowances as provision is made for estimated sales returns, rebates and other applicable discounts and allowances*. Shipping and other distribution costs are charged to cost of product sales.

*The Company prepares its provisions for sales returns and allowances, rebates and discounts based primarily on estimates.* Contractual allowances and rebates result primarily from sales under contracts with healthcare providers, Medicaid programs and other government agencies. *The Company's policy for sales returns allows authorized distributors to return the product three months prior to, and six months*

- 17 -

*after, product expiration. The reserve for sales returns is determined by reviewing the history of returns for products with similar characteristics to Plenaxis® and by utilizing data obtained directly from the Company's authorized distributors.* These data are reviewed to monitor product movement through the supply chain to identify remaining inventory in the supply chain that may result in chargebacks or sales returns. The reserves are reviewed at each reporting period and adjusted to reflect data available at that time. To the extent the Company's estimates of contractual allowances, rebates and sales returns is different from actuals, the Company will adjust the reserve which will impact the amount of product sales revenue recognized in the period of the adjustment.

In November 2003, the Company received regulatory approval to market Plenaxis® in the United States. There is a launch period initiative undertaken in cooperation with substantially all of the Company's distributors which currently provides that the payment terms on purchases of Plenaxis® will be up to 120 days. Through June 30, 2004, payments under the Company's launch period initiative have been made in a timely manner.

In April 2004, the Company entered into a license, supply and distribution agreement with Schering AG ("Schering AG"), of Berlin, Germany (the "Schering AG Agreement"). The Schering AG Agreement provides for a combination of upfront, regulatory approval and performance-based milestone payments, as well as a share of revenue through transfer price payments for drug product which will be supplied by the Company. The Company analyzes its multiple element arrangements to determine whether the elements can be separated and accounted for individually as separate units of accounting in accordance with EITF No. 00-21, "Revenue Arrangements with Multiple Deliverables." Nonrefundable upfront licensing fees and certain guaranteed, time-based payments that require continuing involvement in the form of development, manufacturing or other commercialization efforts by the Company are recognized as licensing revenue ratably over the period under which the Company is obligated to perform those services. Milestone payments are recognized as licensing revenue or product sales when the performance obligations, as defined in the contract, are achieved, so long as the milestone is deemed to be substantive. Performance milestones typically consist of milestones in the development and/or commercialization of a product, such as obtaining approval from regulatory agencies and the achievement of targeted sales levels. Reimbursements of development costs are recognized as licensing revenue as the related costs are incurred.

When the period over which a fee or payment will be recognized as revenue cannot be specifically identified from the contract, management estimates the deferral period based upon other critical factors contained within the contract, including but not limited to patent life or contract term. The Company continually reviews these estimates which could result in a change in the deferral period and might impact the timing and the amount of revenue recognized.

40.    On October 29, 2004, the Company issued a press release announcing its financial results for the third quarter of 2004, the period ended September 30, 2004. For the quarter, the Company reported a net loss of approximately $13,954,000, or $0.27 per diluted share and total revenues of approximately $1,074,000, due to sales of Plenaxis. Defendant Gefter, commenting on the results, stated, in pertinent part, as follows:

> During the past several months, the Company has gained considerable experience in marketing Plenaxis(R), has undergone significant changes to improve its senior management team and has continued to advance its development and discovery technologies. As we look forward, we expect to begin new clinical trials related to our PPI-2458 and Apan clinical development programs. We further expect that our Direct Select(TM) technology platform will continue to expand in its scope and value as we look to partner this unique discovery capability. **All of these changes should positively impact our future as a fully integrated biopharmaceutical organization and we are looking forward to a productive fourth quarter and 2005**. [Emphasis added.]

With regard to Plenaxis, the press release continued, in pertinent part, as follows:

> Plenaxis(R) Update
>
> In late January 2004, the Company launched its lead product, Plenaxis(R), for the treatment of a defined subset of advanced symptomatic prostate cancer patients. During the first half of 2004, the Company focused on launching Plenaxis(R) by building a commercial infrastructure. Included within this build-up was the hiring and training of a field sales force of approximately 40 individuals as well as the establishment of the Plenaxis(R) User Safety (PLUS) Program. Physicians who intend to prescribe Plenaxis(R) must first enroll in the PLUS Program. As of today, the Company has enrolled approximately 3,400 physicians (and hospital pharmacies) in the PLUS Program, with more than 15% of enrolled physicians having already purchased Plenaxis(R), compared to approximately 10% of enrolled physicians at the end of the second quarter. Approximately half of physicians who have purchased Plenaxis(R) have already become repeat prescribers. Using the experience gained during the first nine months of launch, the Company will now focus on improving its messaging regarding both the unique attributes of Plenaxis(R) and the specific patients for whom Plenaxis(R) is appropriate, with a view to building on this growing base of prescribers.
>
> Commenting on the Company's commercialization efforts, Kevin F. McLaughlin, the Company's recently appointed President and Chief Operating Officer, stated, "We are encouraged by the growing base of sales to repeat prescribers. This trend suggests that following their first experience with Plenaxis(R), physicians are pleased with the results and thus are continuing to treat existing patients with, and identify new

- 19 -

patients for, Plenaxis(R) therapy. Accordingly, we expect to see Plenaxis(R) sales continue to build quarter on quarter. We recognize that our sales and marketing organization has faced many challenges, both expected and unexpected, in introducing Plenaxis(R) to the marketplace. These challenges include the need to clearly differentiate, and educate physicians on, the indicated patient population. We believe our ability to meet these challenges has been substantially enhanced by our recently announced hiring of Michael J. Keavany as Senior Vice President, Sales and Marketing, to lead the Plenaxis(R) commercialization efforts. Mr. Keavany's strong background in marketing specialty products will be invaluable towards meeting our commitment of making Plenaxis(R) a commercial success."

As previously disclosed, in June 2003, the Company initiated the regulatory review process in the European Union with the submission of a Marketing Authorisation Application (MAA) in Germany seeking approval to market Plenaxis(R) for the treatment of a broad population of prostate cancer patients. The European registration process is ongoing and the Company anticipates that the German Federal Institute for Drugs and Medical Devices (BfArM) will complete its review of the MAA early in 2005. Assuming favorable action by the BfArM, the Company, with the cooperation and assistance of its partner, Schering AG, plans to seek additional European Union member state approvals under the Mutual Recognition Procedure.

41.    On November 9, 2004, Praecis filed its Form 10-Q for the third quarter of 2004 with

the SEC, which confirmed the previously-announced financial results and was signed by defendant

English.  With regard to the Company's revenue recognition policy, the 10-Q stated, in pertinent

part, as follows:

Revenue Recognition

Revenues from product sales are recognized in the period when the product is delivered, provided there is pervasive evidence that an arrangement exists, the price is fixed or determinable and collection of the related receivable is probable. *Revenues are recorded net of applicable allowances as provision is made for estimated sales returns, rebates and other applicable discounts and allowances*. Shipping and other distribution costs are charged to cost of product sales.

*The Company prepares its provisions for sales returns and allowances, rebates and discounts based primarily on estimates*. Contractual allowances and rebates result primarily from sales under contracts with healthcare providers, Medicaid programs and other government agencies. *The Company's policy for sales returns allows authorized distributors to return the product three months prior to, and six months after, product expiration.* Plenaxis® currently has an approved shelf life of 24 months.  As of September 30, 2004, the Company has shipped product with expiration dates of February 2005 and June 2006. *The reserve for sales returns is determined by reviewing the history of returns for products with similar*

*characteristics to Plenaxis®.* The Company also utilizes daily reports itemizing sales to physicians and hospital pharmacies, obtained directly from its authorized distributors, in order to analyze specific account ordering trends. These data are reviewed to monitor product movement through the supply chain to identify remaining inventory that may result in chargebacks or sales returns. There was approximately $0.4 million of product at distributors at September 30, 2004. The reserves are reviewed at each reporting period and adjusted to reflect available data at that time. The Company accrued approximately $0.5 million in revenue reserves as of September 30, 2004. Reserve activity for the three months ended September 30, 2004 included a $0.2 million reduction related to the termination of the Company's rebate program, offset by a $0.2 million increase adjustment related to potential specific account product returns. To the extent the Company's estimates of contractual allowances, rebates and sales returns is different from actuals, the Company adjusts the reserve which impacts the amount of product sales revenue recognized in the period of the adjustment.

The Company currently provides substantially all of its distributors with payment terms of up to 120 days on purchases of Plenaxis®. Through September 30, 2004, payments have generally been made in a timely manner.

In April 2004, the Company entered into a license, supply and distribution agreement with Schering AG ("Schering AG"), of Berlin, Germany (the "Schering AG Agreement"). The Schering AG Agreement provides for a combination of upfront, regulatory approval and performance-based milestone payments, as well as a share of revenue through transfer price payments for drug product which will be supplied by the Company. The Company analyzes such multiple element arrangements to determine whether the elements can be separated and accounted for individually as separate units of accounting in accordance with EITF No. 00-21, Revenue Arrangements with Multiple Deliverables. Nonrefundable upfront licensing fees and certain guaranteed, time-based payments that require continuing involvement in the form of development, manufacturing or other commercialization efforts by the Company are recognized as licensing revenue ratably over the period under which the Company is obligated to perform those services. Milestone payments are recognized as licensing revenue or product sales when the performance obligations, as defined in the contract, are achieved, so long as the milestone is deemed to be substantive. Performance milestones typically consist of milestones in the development and/or commercialization of a product, such as obtaining approval from regulatory agencies and the achievement of targeted sales levels. Reimbursements of development costs are recognized as licensing revenue as the related costs are incurred.

When the period over which a fee or payment will be recognized as revenue cannot be specifically identified from the contract, management estimates the deferral period based upon other critical factors contained within the contract, including but not limited to patent life or contract term.

The Company continually reviews these estimates which could result in a change in the deferral period and might impact the timing and the amount of revenue recognized. [Emphasis added.]

42.    The statements referenced above in ¶¶27-29, 31-36 and 37-41 were each materially false and misleading when made as they failed to disclose and misrepresented the following material adverse facts which were then known to defendants or recklessly disregarded by them:

(a)    that defendants lacked a reasonable basis for estimating allowances for returns of Plenaxis from its distributors since Plenaxis had never been sold before;

(b)    that defendants lacked a reasonable basis for making comparisons between the return rate for Plenaxis and the return rate for other products, which were not identical to Plenaxis;

(c)    that the Company's revenue recognition practices violated GAAP; and

(d)    as a result of the foregoing, defendants' statements concerning the Company's financial results were materially false and misleading at all relevant times.

**The Truth Emerges**

43.    Then, on December 6, 2004, Praecis shocked the market when it issued a press release announcing that its fourth-quarter sales would fall behind its third-quarter results because of the slow adoption of its cancer drug Plenaxis. The Company also stated that it would cease to provide any future guidance on its earnings and revenues until a consistent trend for Plenaxis sales emerges. The press release stated, in pertinent part as follows:

PRAECIS PHARMACEUTICALS INCORPORATED, today provided an update on the Company's commercialization of Plenaxis(R) (abarelix for injectable suspension) in the United States. The Company stated that Plenaxis(R) is an important therapy for patients in the indicated population who have limited or no other treatment options available and reported that physician feedback reaffirms that Plenaxis(R) achieves its intended therapeutic goal of providing these patients with a non-surgical option for managing the symptoms of their advanced prostate cancer.

However, as previously reported, since the initial launch of Plenaxis(R), the Company has faced many challenges that have had an adverse impact on the uptake of the product in the market. These challenges have included the need to achieve

sales force efficiency, establish more effective messaging to educate physicians about the product's indication and the appropriate patient population, and overcome physician uncertainty and concerns over reimbursement. More specifically, the Company has found that educating physicians about the Plenaxis(R) User Safety (PLUS) Program and the appropriate patient population for Plenaxis(R) has markedly increased the sales cycle and requires a very focused sales message and sales call. In addition, physicians' concerns over obtaining reimbursement coverage for Plenaxis(R) during the initial launch phase have been compounded this quarter by increasing physician uncertainty regarding the impact of changing pharmaceutical reimbursement for 2005 as a result of recent Medicare reform. *The impact of these challenges has negatively affected Plenaxis(R) sales, and therefore, the Company now expects sales to decrease from the third to the fourth quarter of 2004.*

Despite this shortfall, the Company continues to expect to end the year with cash, cash equivalents and marketable securities of at least $75.0 million.

The Company is committed to making this innovative product available to patients and continues to work diligently to address these challenges, including as follows:

-- In September, Kevin F. McLaughlin was promoted to the position of President and Chief Operating Officer and in November, Michael J. Keavany was hired as the Senior Vice President, Sales and Marketing, to lead the re-launch of Plenaxis(R). With his extensive experience launching specialty pharmaceuticals and managing specialty sales forces, Mr. Keavany brings crucial skills to the Company as it strengthens and focuses its sales force, hires representatives for open territories, repositions its marketing campaign and re-launches Plenaxis (R).

-- The Company continues to refine its marketing message, materials and programs to more effectively differentiate, and educate physicians on, the indicated patient population in order to maximize the usage of Plenaxis(R) in those patients.

-- As of today, the Company has enrolled approximately 3,500 physicians (and hospital pharmacies) in the PLUS Program and continues to work towards converting these enrolled physicians to Plenaxis(R) prescribers.

-- In November, the HCPCS National Panel assigned a "J-Code" covering the in-office administration of Plenaxis(R), effective as of January 1, 2005. This code allows for a more streamlined submission of reimbursement claims by treating physicians.

The Company believes that its re-launch of Plenaxis(R) will enable it to capitalize on the product's long term potential. **During this re-launch period in the U.S. market, and while the Company awaits approval of its marketing application for Plenaxis(R) in Germany (and then additional European countries), the Company has decided to remove its previous short and long term sales and earnings guidance, and does not currently anticipate providing further guidance until a consistent trend for Plenaxis(R) sales emerges.** [Emphasis added.]

44.    Upon this news, shares of the Company's stock fell more than 25%, or $0.56 per share, to close at $1.61 per share, on extremely high trading volume.

45.    The market for Praecis' common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Praecis' common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Praecis common stock relying upon the integrity of the market price of Praecis' common stock and market information relating to Praecis, and have been damaged thereby.

46.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Praecis' common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

47.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Praecis' business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Praecis and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing

- 24 -

the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

48.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Praecis, their control over, and/or receipt and/or modification of Praecis' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Praecis, participated in the fraudulent scheme alleged herein.

49.    Defendants were further motivated to engage in this course of conduct in order to sell their personally-held Praecis common stock to the unsuspecting public, thereby reaping almost $4.5 million in proceeds. The following chart indicates defendants Gefter and McLaughlin's sales of Praecis common stock at artificially inflated prices during the Class Period:

Praecis Pharmaceuticals
Summary of Insider Sales: 11/03 - 12/04
Source: Thomson Financial

| Name | Position | Date | Shares Sold | Price | Proceeds |
|------|----------|------|-------------|-------|----------|
| M. GEFTER | CEO,CB,OD | 2/4/2004 | 35,000 | $6.51 | $227,850 |
| | | 2/4/2004 | 30,000 | $6.45 | $193,500 |
| | | 2/4/2004 | 23,500 | $6.40 | $150,400 |
| | | 2/4/2004 | 22,500 | $6.50 | $146,250 |
| | | 2/4/2004 | 20,000 | $6.47 | $129,400 |
| | | 2/4/2004 | 10,000 | $6.30 | $63,000 |
| | | 2/4/2004 | 9,000 | $6.41 | $57,690 |
| | | 2/3/2004 | 80,000 | $6.50 | $520,000 |

- 25 -

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  | 2/3/2004 | 50,000 | $6.52 | $326,000 |
|  |  | 2/3/2004 | 20,000 | $6.51 | $130,200 |
|  |  | 12/2/2003 | 75,000 | $7.50 | $562,500 |
|  |  | 12/2/2003 | 35,000 | $7.55 | $264,250 |
|  |  | 12/2/2003 | 25,000 | $7.42 | $185,500 |
|  |  | 12/2/2003 | 25,000 | $7.48 | $187,000 |
|  |  | 12/2/2003 | 25,000 | $7.50 | $187,500 |
|  |  | 12/2/2003 | 15,000 | $7.45 | $111,750 |
|  |  | 12/2/2003 | 15,000 | $7.46 | $111,900 |
|  |  | 12/2/2003 | 15,000 | $7.44 | $111,600 |
|  |  | 12/2/2003 | 12,500 | $7.51 | $93,875 |
|  |  | 12/2/2003 | 12,500 | $7.45 | $93,125 |
|  |  | 12/2/2003 | 10,000 | $7.52 | $75,200 |
|  |  | 12/2/2003 | 10,000 | $7.56 | $75,600 |
|  |  | 12/2/2003 | 10,000 | $7.52 | $75,200 |
|  |  | 12/2/2003 | 10,000 | $7.44 | $74,400 |
|  |  | 12/2/2003 | 5,000 | $7.42 | $37,100 |
|  |  |  | 600,000 |  | $4,190,790 |
| K. MCLAUGHLIN | CFO,O,SVP | 12/2/2003 | 7,800 | $7.50 | $58,500 |
|  |  | 12/2/2003 | 5,800 | $7.54 | $43,732 |
|  |  | 12/2/2003 | 5,000 | $7.49 | $37,450 |
|  |  | 12/2/2003 | 4,500 | $7.40 | $33,300 |
|  |  | 12/2/2003 | 2,700 | $7.43 | $20,061 |
|  |  | 12/2/2003 | 2,700 | $7.52 | $20,304 |
|  |  | 12/2/2003 | 2,200 | $7.53 | $16,566 |
|  |  | 12/2/2003 | 1,600 | $7.40 | $11,840 |
|  |  | 12/2/2003 | 1,500 | $7.55 | $11,325 |
|  |  | 12/2/2003 | 1,100 | $7.44 | $8,184 |
|  |  | 12/2/2003 | 100 | $7.41 | $741 |
|  |  |  | 35,000 |  | $262,003 |
|  | Grand Total: |  | 635,000 |  | $4,452,793 |

## Applicability Of Presumption Of Reliance:
## Fraud On The Market Doctrine

50.     At all relevant times, the market for Praecis' common stock was an efficient market for the following reasons, among others:

(a)     Praecis' stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- 26 -

(b)    As a regulated issuer, Praecis filed periodic public reports with the SEC and the NASDAQ;

(c)    Praecis regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Praecis was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

51.    As a result of the foregoing, the market for Praecis common stock promptly digested current information regarding Praecis from all publicly-available sources and reflected such information in Praecis' stock price. Under these circumstances, all purchasers of Praecis' common stock during the Class Period suffered similar injury through their purchase of Praecis' common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

52.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking

- 27 -

statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Praecis who knew that those statements were false when made.

## COUNT I

### Violation Of Section 10(b) Of The Exchange Act Against And Rule 10b-5 Promulgated Thereunder Against All Defendants

53.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Praecis' business, operations, management and the intrinsic value of Praecis common stock; (ii) enable insiders to sell close to $4.5 million of their personally-held shares of Praecis stock at artificially inflated prices; and (iii) cause Plaintiff and other members of the Class to purchase Praecis common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

55.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Praecis' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

56.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Praecis as specified herein.

57.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Praecis' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Praecis and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Praecis common stock during the Class Period.

58.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

- 29 -

59.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Praecis' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Praecis' common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Praecis' publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Praecis common stock during the Class Period at artificially high prices and were damaged thereby.

61.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Praecis was

experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Praecis common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

63.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

64.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.    The Individual Defendants acted as controlling persons of Praecis within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by

Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.    As set forth above, Praecis and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  January 21, 2005

By his attorneys,

Thomas G. Shapiro BBO #454680
Theodore M. Hess-Mahan BBO #557109
SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA  02109
Telephone:  617/439-3939
617/439-0134 (fax)


LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
200 Broadhollow Road, Suite 406
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1600
San Diego, CA  92101-4297
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

- 33 -

11/14/05    14:07    LERACH COUGHLIN → 16313671173    NO.563    P02

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
197 South Federal Highway, Suite 200
Boca Raton, FL 33432
(561) 750-3000
(561) 750-3364 Facsimile

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Dr. Richard Bassik ("Plaintiff"), declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.     Plaintiff has reviewed the Praecis Phara. complaint and authorized its filing.

2.     Plaintiff did not purchase any common stock/securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate any private action under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.     The following includes all of Plaintiff's transactions during the Class Period specified in the complaint for the common stock/securities that are the subject of this action:

| SECURITY (Common Stock, Call, Put, Bond) | TRANSACTION (Purchase, Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| Praecis Pharm | Purchase | 400 | 7-27-04 | 2.48 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Please list additional transactions on a separate sheet if necessary.

4.     Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below:

Netopia, Decode Genetics, Maxim Pharmaceuticals, Stonepath, Converium, Sourcecorp, Royal Group Technologies

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14 day of
_____January_____, 2005

SIGNATURE

%JS 44  (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
DR. RICHARD BASSIN

**DEFENDANTS**
PRAECIS PHARMACEUTICALS, MALCOLM GEFTER, KEVIN McLAUGHLIN, EDWARD ENGLISH and WILLIAM K. HEIDEN

FILED IN CLERKS OFFICE
2005 JAN 21  A 11: 45

(b) County of Residence of First Listed Plaintiff  _OUT OF STATE_
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

US. DISTRICT COURT
DISTRICT OF MASS.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Theodore M. Hess-Mahan    Tel: (617) 439-3939
Shapiro Haber & Urmy LLP    Fax: (617) 439-0134
53 State Street
Boston, MA 02109

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

|   |   |   |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | X 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

05 10134

|   | PTF | DEF |   | PTF | DEF |
|---|-----|-----|---|-----|-----|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | X 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | | | | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | | or Defendant) | Determination Under |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS— Third Party | Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

X 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)
15 USC §§78j(b) and 78t(a) and 17 CFR 240.10b-5

## VII. REQUESTED IN COMPLAINT:
X CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ 0    CHECK YES only if demanded in complaint:
JURY DEMAND:  X Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):  JUDGE  O'TOOLE    DOCKET NUMBER  04-CV-12581 GAO

DATE  1/2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44 Reverse (Rev. 3/99)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

### Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**   **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

    (b.) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

    (c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**   **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only) Richard Bassin  v. Praecis Pharmaceuticals Inc, et al FILED
                                                                              IN CLERKS OFFICE

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local

    rule 40.1(a)(1)).                                                          2005 JAN 21 · A II: 45

    ___    I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    _X_    II.     195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, *Also complete AO 120 or AO 121 COURT
                   740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. for patent, trademark or copyright cases ASS.

    ___    III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                   315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                   380, 385, 450, 891.

    ___    IV.     220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                   690, 810, 861-865, 870, 871, 875, 900.                      05 ⊃ 10134 GAO

    ___    V.      150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this
    district please indicate the title and number of the first filed case in this court.
    Katz v. Praecis Pharmaceuticals, Inc. et al., No. 04-CV-12581-GAO

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                        YES ☐       NO  **X**

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28
    USC §2403)
                                                        YES ☐       NO  **X**

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                        YES ☐       NO  **X**

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                        YES ☐       NO  **X**

7.  Do all of the parties  in this action, excluding governmental agencies of the united states and the Commonwealth of
    Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule 40.1(d)).
                                                        YES  **X**   NO ☐

    A.   If yes, in which division do all of the non-governmental parties reside?

         Eastern Division  **X**        Central Division ☐              Western Division ☐

    B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental
         agencies,  residing in Massachusetts reside?

         Eastern Division ☐            Central Division ☐              Western Division ☐

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes,
    submit a separate sheet identifying the motions)
                                                        YES ☐       NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME Theodore M. Hess-Mahan _____
ADDRESS Shapiro Haber & Urmy LLP, 53 State Street, Boston, MA 02109 _____
TELEPHONE NO.  (617) 439-3939 _____

                                                        (Bassin CategoryForm.wpd  - 10/17/02)